# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 3, 2015 Session

## STATE OF TENNESSEE v. ANGELA AYERS

**Appeal from the Criminal Court for Shelby County**
**No. 12-03161     J. Robert Carter, Jr., Judge**

---

**No.  W2014-00781-CCA-R3-CD  - Filed July 16, 2015**

---

The Defendant, Angela Ayers, was found guilty by a Shelby County Criminal Court jury of voluntary manslaughter, false report, and employing a firearm during the commission of a dangerous felony, Class C felonies.  *See* T.C.A. §§ 39-13-211 (2014), 39-16-502 (2014), 39-17-1324 (2010) (amended 2012).  The trial court sentenced the Defendant as a Range I, standard offender to six years for the manslaughter conviction, which was to be suspended to probation after two years' confinement, to four years for the false report conviction, which was to be suspended to probation after two years' confinement, and to six years' confinement at 100% service for the firearm conviction.  The court ordered the six-year sentence for the firearm conviction to be served consecutively to the other sentences, for an effective twelve-year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to support her convictions for voluntary manslaughter and false report, (2) the indictment relative to the firearm conviction is insufficient, (3) the trial court erred by excluding proof of the victim's abusing the Defendant and her son, (4) the trial court erred relative to expert medical testimony, and (5) the trial court erred by refusing to provide the jury with a self-defense instruction.  We affirm the judgments of the trial court relative to the voluntary manslaughter and false report convictions, but we reverse the judgment, vacate the conviction, and dismiss the charge for employing a firearm during the commission of a dangerous felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Vacated and Dismissed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

M. Haden Lawyer (on appeal and at trial) and Andrew Plunk (at trial), Memphis, Tennessee, for the appellant, Angela Ayers.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience Branham and Kenya Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to a domestic disturbance in which the victim, Tario Graham, died from a single gunshot wound to the head. Angelica Mitchell, the victim's sister, testified that the Defendant was the mother of the victim's younger son, who was five years old at the time of the trial. She said the Defendant and the victim's relationship spanned about ten years. She never saw the Defendant and the victim argue and thought they had a good relationship. She said the victim was tall, slim, and had stomach problems, although she did not know any details.

Earl Jones, the victim's cousin, testified that on February 23, 2012, he picked up the victim at home early that morning. The men went to the lumberyard to buy materials for the victim's house. The men returned to the victim's house around 10:00 a.m., and Mr. Jones said the Defendant, her and the victim's son, and her sister were there. The Defendant and the victim began arguing. Mr. Jones walked outside, and the Defendant's sister left. Mr. Jones said the argument was about women. He heard the Defendant say she wanted the victim out of the house and the victim say that he did not want to argue. Mr. Jones sat on the hood of a car parked in the driveway and waited for the victim. The argument lasted about three minutes, and Mr. Jones saw the victim leave the house and run toward the back of the house. The victim returned to the front of the house about fifteen to twenty minutes later.

Mr. Jones testified that after the victim ran toward the back of the house, he heard a gunshot from inside the house. He told the victim that the Defendant had fired a gun, and the victim told Mr. Jones that the Defendant was not going to do anything. The victim began walking down the sidewalk toward a convenience store and told Mr. Jones to join him. Mr. Jones said the victim was walking in front of him when the Defendant came out of the house, walked behind them, yelled, cursed the victim, and accused the victim of knocking out her tooth. Mr. Jones said the Defendant yelled, "You, B----, you knocked my teeth out of my mouth," "You want to fight now," "Why you running now," and "Come on back and fight." Mr. Jones saw the Defendant holding a gun. The Defendant told Mr. Jones to move, and the Defendant attempted to fire the gun, but it misfired. Mr. Jones said the Defendant fired the gun again, and the victim fell to the ground. Although he did not know where the victim had been shot, he assumed the Defendant shot the victim in the back of the head because the victim had not been facing the Defendant.

-2-

Mr. Jones testified that when the victim fell, the Defendant ran to the victim, talked about what she had done, returned home, changed her clothes, and returned to the scene. While the Defendant was gone, someone driving a truck stopped next to the victim, who was lying in the street, to prevent drivers from running over him. The Defendant talked to the first responders at the scene, and Mr. Jones heard the Defendant tell them that the victim had been hit by a car. The Defendant did not have the gun at that time.

Mr. Jones identified the clothing the Defendant wore at the time of the shooting and testified that the Defendant did not have any visible blood on her clothes before the shooting. Mr. Jones did not see the victim hit the Defendant. He said the victim was short, weighed about 120 pounds, and suffered from stomach ulcers. Mr. Jones said the victim did not have a gun that day and denied ever seeing the victim carry a gun. He said that the day of the shooting was the first time he had seen the Defendant carry a gun.

On cross-examination, Mr. Jones testified that although he left the house when the victim and the Defendant began to argue, he heard the argument from outside the house. He heard what he thought was a physical altercation, but he denied hearing them argue about anything other than the victim's cheating. He heard tussling and wrestling from inside the house. He said the Defendant did not have any injuries when he and the victim returned from the lumberyard. He said that the Defendant "was talking crazy" and screaming when she left the house with the gun. On redirect examination, he clarified that he looked at the Defendant when he saw the gun, that he saw the Defendant pull the trigger twice, and that after the gun fired, he looked at the victim, who fell.

Terrell Randle testified that on February 23, 2012, he lived across the street from the Defendant and the victim. He knew the victim but was never introduced to the Defendant. He said that before the shooting, he was working on his car. He said he saw Mr. Jones and the victim walking down the street, and the Defendant was following them. He heard the Defendant yell, "M.F. it's your last time hitting me. You ain't going to do it no more[.]" He said the victim and Mr. Jones did nothing in response to the Defendant's yelling and continued walking down the street. He said the Defendant was a couple feet behind them, and she did not appear to have any injuries.

Mr. Randle testified that the Defendant had a small object in her hand when she left the house. He said that the victim and Mr. Jones walked out of his sight and that he heard a gunshot. Mr. Randle walked to the victim's location, and he said the Defendant ran past him and toward her house. He noticed the Defendant wore sweat pants and a shirt. When Mr. Randle arrived at the victim's location, he saw the victim lying in the street and said the victim did not respond when he called out the victim's name. He said the Defendant returned, was frantic and shocked, and said someone hit the victim with a car. He noticed

the Defendant had changed her clothes and was wearing camouflage shorts. The Defendant did not have a gun when she returned, but he noticed the Defendant had "a bloodstain on her lip."

On cross-examination, Mr. Randle testified that he did not know what occurred after the victim and Mr. Jones walked out of his sight but before he heard the gunshot. He and the Defendant did not speak. He said that when the Defendant returned to where the victim was lying in the street, she seemed disturbed and emotional.

Edwin Boswell testified that on the day of the shooting, he was at "the candy lady's house" located across the street from the Defendant and the victim's house. Mr. Boswell and the victim were good friends, and he met the Defendant through the victim. He did not witness the shooting. On cross-examination, Mr. Boswell testified that he had spent considerable time at the Defendant and the victim's house and that he never saw them fight. He did not recall providing a statement to the police or telling the police he saw the Defendant and the victim running down the street.

Darren Turner testified that he was working outside at the time of the shooting. He saw the victim walk down the street and the Defendant walk behind the victim. He heard a gunshot and ran to the victim's location. He said the Defendant told him to call the police and ran to her house. The Defendant returned to the scene, and Mr. Turner said she had a "receiver" in her hand and said, "Come on, Tario. I'm sorry. I'm sorry, Baby." He said that when he first saw the Defendant, she was wearing camouflage shorts but was wearing jogging pants when she returned. On cross-examination, Mr. Turner testified that the Defendant was upset and yelling when she returned to the scene.

Josea Franklin, Sr., testified that on the day of the shooting, he was across the street from the Defendant and the victim's house visiting his cousin, Sherry Talbert. He arrived at Ms. Talbert's house between 11:00 a.m. and 12:00 p.m. and said he saw the victim and another man walking down the street about five minutes later. Mr. Franklin saw a woman, whom he did not know, follow the men. He said the woman yelled and cursed that "she was tired of B.S. and that's the last time you put your hands on me." He said the victim and the other man continued walking down the street as the woman yelled. He recalled the men did not turn and look at the woman. He did not witness the shooting, but he saw the woman run toward and enter the victim's house and return to the scene. He said that when the woman returned to the scene, she had changed clothes and that she said the victim was hit by a car and asked those present which car hit the victim. He recalled the woman wore jogging pants before the shooting and shorts afterward. He was unable to identify the woman because he had never seen her at close range before that day.

On cross-examination, Mr. Franklin testified that the woman was upset and agitated when he saw her following the men down the street. He recalled the woman said, "I'm tired of you hitting me. This is the last time hitting me." He did not witness the shooting or hear the gunshot. He saw people running down the street and followed them.

Memphis Police Communications Supervisor Pamela Rowlett identified two recorded 9-1-1 calls that the police received relative to the shooting. In the first recording, a woman requested the police and an ambulance respond to the scene. The caller reported that a woman had shot a man, who was lying in the street. The woman said the shooter was African-American, was wearing black pants and a yellow shirt, and ran into a house nearby. In the second recording, a male caller reported that someone had been shot and that the victim looked deceased. The caller did not witness the shooting.

Memphis Fireman and Paramedic Steve Pecaitis, Jr., testified that he responded to the scene of the shooting after being flagged down by a passerby. He and his partner were only told that the victim was lying in the street. He initially thought the victim had been hit by a car because no obvious signs of injury were visible. After the victim was placed inside the ambulance, Mr. Pecaitis found a large laceration on the forehead. Upon cleaning the wound, he found signs of possible entrance and exit gunshot wounds to the right and left brow areas, which were connected by the laceration. The victim was breathing at that time but was non-responsive. Mr. Pecaitis saw a skull fragment and brain matter and slightly compressed the wound to control the bleeding. The victim's condition worsened en route to the hospital, and he stopped breathing before arriving at the hospital. Mr. Pecaitis said, though, the victim was alive when they arrived.

Memphis Police Officer Shane Evans testified that he responded to the shots-fired call and that he was told the responsible person was at a house nearby. When he arrived, the Defendant ran down the street and screamed, "He got hit by a car. He got hit by a car." He said the Defendant looked frantic but was not crying or upset. He recalled the Defendant wore a yellow shirt. Officer Evans drove his police car to the scene of the shooting and found the paramedics treating the victim.

Officer Evans testified that he spoke to several witnesses at the scene who provided statements that were inconsistent with the victim's being hit by a car. Officer Evans said he spoke to the Defendant again and asked her what occurred. He noted the Defendant's calm demeanor and said she admitted shooting the victim. The Defendant told the officer that her younger son and the gun she used to shoot the victim were inside her house. The Defendant told the officer that she and the victim argued and that the victim hit her. Although Officer Evans did not notice initially any injuries to the Defendant, he saw facial swelling where the Defendant said the victim struck her.

On cross-examination, Officer Evans testified that he told the paramedics that the victim had been hit by a car based on the Defendant's statement. On redirect examination, he said that the Defendant's statement caused confusion. He said that when he arrived at the victim's location, a car was parked a few feet away and that he thought a pedestrian might have been struck by the car. He said shootings were less common than a car striking a pedestrian.

Memphis Police Officer Sondra Wicks testified that she responded to the scene to assist other officers. Although Officer Wicks did not speak to the Defendant, she saw the Defendant from a distance. She recalled the Defendant wore extremely short shorts and a small t-shirt. While standing outside the Defendant and the victim's house, she saw a young boy crying and standing just inside the front door. When she learned the boy was inside the house alone, she unsuccessfully attempted to enter. Officer Wicks said the Defendant's mother came to the house and was able to instruct the boy how to unlock the door. Officer Wicks did not allow the boy and grandmother to enter the house, but she entered to obtain a coat for the boy and pants for the Defendant because it was cold that day. When Officer Wicks learned the Defendant had been wearing the pants earlier that day, she returned the pants to the living room where she found them. She said that when she grabbed the pants from the sofa, a pair of red underwear fell from them. Officer Wicks did not touch the underwear.

Memphis Police Officer Brandon Westrich testified that he detained the Defendant after he arrived at the scene. He identified the Defendant's cell phone and blue hooded sweatshirt. He transported the Defendant to the police station and said she appeared calm and quiet and did not speak to him.

On cross-examination, Officer Westrich testified that the Defendant was inside a police cruiser when he arrived at the scene. He identified photographs of the Defendant's forehead, elbow, left side of her body, mouth, and clothes she wore at the time of her arrest. The photographs showed a cut to her forehead, a possible injury to her elbow, dried blood on her mouth, and swollen lips.

Memphis Crime Scene Officer Tristan Brown testified that he processed the scene, the victim, and the victim and the Defendant's house. He found an empty gun holster in a bedroom and a .22-caliber Smith & Wesson revolver inside a toilet tank in a bathroom. He identified an envelope containing six live .22-caliber rounds and one fired .22-caliber cartridge casing found inside the house. He identified red underwear, white tennis shoes, and a black telephone recovered from the victim and the Defendant's house.

On cross-examination, Officer Brown clarified that the tennis shoes were recovered from a driveway next door to the Defendant and the victim's house. He did not know who owned the shoes but said a police officer at the scene thought the shoes might have belonged to the Defendant and might have had blood on them. Relative to the firearm found in the toilet tank, he said that the toilet tank lid was broken before he arrived and that the revolver was in plain view.

Dr. Miguel Laboy, Shelby County Assistant Medical Examiner and expert in forensic pathology, testified that Dr. Caruso performed the victim's autopsy before Dr. Caruso was hired as the Chief Medical Examiner in Denver, Colorado. Dr. Laboy reviewed the autopsy and toxicology reports and photographs taken during Dr. Caruso's autopsy of the victim, which were received as exhibits. After reviewing the reports and photographs, Dr. Laboy concluded that the cause of death was a gunshot wound to the head. He agreed with Dr. Caruso's conclusion that the manner of death was homicide.

Dr. Laboy identified photographs of the entry wound and testified that the bullet entered above the right eye and traveled slightly from right to left. He said that the bullet perforated the brain and that the orbital bones around the eyes and the base of the skull were fractured. He noted the bullet was recovered from the left rear side of the head. He said the autopsy report noted that the victim had a laceration on the side of the eye and abrasions on the right arm, left elbow, and left leg. The victim's toxicology analysis showed the presence of marijuana and isopropyl alcohol.

On cross-examination, Dr. Laboy testified that he could not perform an autopsy without examining a body and that he was not present during the victim's autopsy. He became involved in this case days before the trial and said he reviewed Dr. Caruso's file the morning of his testimony. He said that before the victim arrived at the medical examiner's office, his heart, lungs, kidneys, liver, adrenal glands, pancreas, and a portion of his small intestines were removed for organ donation. He did not believe that an evaluation of those organs would have indicated a different cause of death because the organs had to be viable to be transplanted. He agreed, though, he did not review any documentation relative to the organs' conditions at the time of harvest.

Dr. Laboy testified that no exit wound was documented in the autopsy report or in the photographs. He concluded that the victim was not shot in the back of the head. He said that the report showed no soot or stippling, but he was not comfortable giving an opinion about the distance between the victim and the gun at the time of the shooting. He said the alcohol present in the victim's blood was consistent with his receiving medical treatment.

On redirect examination, Dr. Laboy testified that regardless of the condition of the organs harvested for transplant, the cause of death was the gunshot wound to the head. He said that it was unlikely someone would have survived such an injury and that if someone had survived, he or she would have been in a vegetative state.

Tennessee Bureau of Investigation (TBI) Special Agent Cervinia Braswell, an expert in firearms identification, testified that she analyzed a .22-caliber Smith & Wesson revolver, two fired cartridge casings, six unfired live bullets, and the fired bullet recovered during the victim's autopsy. She test-fired the revolver to make comparisons. She concluded that the bullet recovered during the autopsy had been fired from the revolver. She also concluded that the fired cartridge casings submitted for analysis had the same class characteristics and some of the same individual characteristics and that the casings could have been fired from the revolver, although she could not make a conclusive determination.

Arianne Stewart testified for the defense that she and the Defendant were coworkers and that she had purchased narcotics from the victim. On February 23, 2012, Ms. Stewart arrived at the Defendant and the victim's house between 12:00 and 1:00 p.m. While Ms. Stewart was there, the Defendant and the victim argued about the garbage and something the Defendant found on the victim's cell phone. Ms. Stewart heard the Defendant ask the victim to take out the garbage before he left, and the victim refused. Ms. Stewart was in the kitchen when the argument began in the bedroom. She saw the victim leave the house and return immediately and said the victim began hitting the Defendant, called her "b----" and "w----," and called her older son "slow." Ms. Stewart said the physical altercation began in the living room near the kitchen area. She saw the victim pull the Defendant's hair, put the Defendant on the floor, and kick and hit the Defendant while she was on the floor. Ms. Stewart said the Defendant was bleeding and had a "busted" lip after the altercation. The Defendant and the victim's son was also present during the altercation.

Ms. Stewart testified that she did not intervene during the altercation because she feared the victim, who was possessive and controlling. She stayed in the kitchen during the incident and said the Defendant did not hit the victim. After the incident, the victim left the house, and the Defendant went to the bathroom to clean her face. Ms. Stewart waited a few minutes and left without speaking to the Defendant. She returned to the area after the shooting. She stated that the Defendant did not own a firearm.

On cross-examination, Ms. Stewart testified that she left the house around 1:00 p.m., after waiting five to ten minutes. She was worried but said the Defendant did not call the police. She said the Defendant and the victim's son was on the couch when the Defendant went to the bathroom. Ms. Stewart saw the victim and his cousin standing beside a car when she left.

The Defendant testified that on February 23, 2012, she awoke and took her older child to school. After she returned, the victim and her younger son awoke. The victim smoked marijuana and told the Defendant he was going to his grandparents' house to stay with his grandmother while his grandfather ran an errand. While the victim was gone, he called the Defendant and told her that his cousin was coming to the house to purchase heroin. Although the Defendant told the victim that she would handle it, the Defendant told the cousin that the victim took the drugs with him. The Defendant said she lied because she did not want to sell drugs. The Defendant said the victim was mad when he returned, obtained the drugs, and left again.

The Defendant testified that Ms. Stewart arrived around 12:00 p.m., that they talked for a while, and that Ms. Stewart entered the kitchen about the time the victim returned. The Defendant said that they were in the process of renovating their house and that the victim complained the work to the house would not be completed if he had to come home every time someone wanted to buy drugs. The Defendant said that the conversation became heated and that she told the victim too much activity occurred at their house. She said the victim became angry, and she mentioned the victim's refusing to take out the garbage. The victim told her to have her older son take out the trash. The Defendant said the victim called her son "stupid," which angered her. She said that "this [was] not the first time that [the victim had] done this . . . . He's hit my son before." The Defendant was hurt and embarrassed by the victim's comment about her son. She said, "F--- you," to the victim, who began hitting her. The Defendant said she saw the victim's rage, which she had seen throughout their relationship. She said the victim hit her in the mouth and head with his fist, knocking her to the floor. The victim kicked her after she fell. Afterward, the victim left the house, and the Defendant got up from the floor. The Defendant said that her head hurt and that she was humiliated and angry. She picked up the victim's gun from the bedroom and left the house.

The Defendant testified that after she left the house, she saw the victim and his cousin walking down the street. The Defendant said she was angry because she had endured the victim's abuse for about seven years and because the victim had also abused her son. She said the victim did not allow her to have friends, did not allow her mother at their house, and disrespected her family. The Defendant said she was also hurt and humiliated because the victim had hit her and insulted her son on the day of the shooting, although the victim had said he would no longer do those things.

The Defendant testified that she did not know what she was going to do with the gun. Although she was angry and hurt, she said she loved the victim. She said she gave the victim everything and did whatever he asked. She said that three weeks before the shooting, they fought when she told the victim she wanted to leave. She said the victim told their son to go to his room because "your mama about to get her a-- beat tonight." The Defendant told the

victim that she did not want to sell drugs for him anymore and wanted the victim to change. The victim told the Defendant, "I'm going to change . . . don't leave. When we get your taxes, we're going to fix up the house. It's going to work." The Defendant said she thought of all these things as she walked down the street behind the victim.

The Defendant testified that she yelled at the victim as she walked behind him. She asked him why he hit her yet again and in front of their child. She said she only wanted to know why he had hit her, although he had said he would not place his hands on her again. She followed the victim to the corner of the street and continued to yell at him. She said she usually did not disrespect the victim because she knew the consequences. She knew people were outside watching and said it must have angered the victim, who did not tolerate disrespect. She said "grown men" feared the victim. As the Defendant continued yelling, the victim stopped and turned. She said she pulled out the gun, closed her eyes, and fired the gun when she saw the victim coming toward her. She said she fired the gun because the victim was coming toward her, which scared her. She denied wanting to kill him and said she was not thinking clearly or about what would happen when she fired the gun.

The Defendant testified that she could not believe she had shot the victim and that she ran to him, called his name, and repeatedly said, "Baby, baby, what have I done[?] What have I done?" She said that although the victim was abusive, she loved him and would never have hurt him. The victim was the father of one of her children, and their relationship spanned many years. She said she put the victim's needs before anyone else's needs. She said that after she realized the victim had been shot in the head, she urinated on herself. After she yelled for someone to call for an ambulance, she ran home and lost one of her shoes on the way. Once she arrived home, she called 9-1-1, reported that the victim had been hit by a car because a bystander said the victim had probably been hit by a car, changed her underwear and pants, and placed the gun in the toilet tank. She said she placed the gun in the toilet tank because she was scared and did not want the gun in her possession. She said she was frantic and in disbelief of the events.

The Defendant testified that she returned to the scene and that she told the paramedics to help the victim. After the victim was transported to the hospital, she told the police he was hit by a car because she was scared of what she had done. She did not speak to the officers again, and she was arrested that day. She consented to a search of her home after the police threatened not to release her children to her family. She identified photographs of injuries to her mouth from the victim's hitting her and to her elbow from falling to the floor after the victim hit her. The Defendant stated that at the time she pulled out the gun, she thought of all the times the victim hit and hurt her, the embarrassment she felt from other people witnessing the abuse, and the anger she felt from the victim's calling her son stupid and hitting her son with an extension cord. She said that she was hurt, angry, and humiliated and

-10-

that the same things occurred repeatedly with the victim. She said that she "saw stars" and "was seeing red" and that she was not thinking clearly and did not intend to kill the victim.

On cross-examination, the Defendant testified that her relationship with the victim lasted six years. When questioned about the lack of police reports relative to previous incidents of domestic assault, the Defendant stated that the victim "jumped on" her when she was pregnant and that she told the police the victim had an open warrant for domestic violence for jumping on a previous girlfriend. She agreed she did not call the police on the day of the shooting after the victim hit her and said she was too scared to call the police most of the time.

The Defendant testified that the house contained drugs and many guns at the time the police searched it. The gun she used was kept in the bedroom, and she knew it was loaded. She agreed her younger son was inside the house when the victim struck her and said afterward she was not thinking clearly when she obtained the gun from the bedroom. She admitted she did not know what her son was doing at that time. She denied, though, wanting to kill the victim. She recalled placing the gun inside her pants. She agreed the victim was not inside the house when she obtained the gun but said she was always in fear of the victim and did not know if he was still nearby. She agreed she walked outside with the gun and followed the victim down the street. She denied telling Mr. Jones to get out of the way. Although she agreed the gun misfired once, she denied thinking about killing the victim. She said that she felt as though she experienced déjà vu because the victim hit her three weeks before the shooting. She discussed the cycle of violence, including the victim's apologizing and making promises, which were ultimately always broken. She said she had endured enough.

The Defendant testified that she and the victim did not argue about the victim's dating other women. She denied she looked through the victim's cell phone and said, "You don't touch [the victim's] phone." She said Ms. Stewart was in the kitchen when the victim struck her, and Mr. Jones was outside the house. She said that as she walked behind the victim and Mr. Jones, she cried and yelled at the victim. She admitted she placed the gun in the toilet tank to hide it.

Memphis Police Sergeant Thomas Mote testified in rebuttal that he obtained and executed the search warrant at the Defendant and the victim's house. He said a pair of red underwear, a gun holster, a Smith & Wesson .22-caliber revolver, and a residential cordless telephone were seized during the search. He said no drugs or additional firearms were found. On cross-examination, he stated that he did not participate in the search but that he oversaw the operation. He agreed that it was possible the officers missed something and that the search warrant specified the police were looking for only one gun.

-11-

Memphis Police Sergeant Daniel Cordero testified that he spoke to Candice Ayers, the Defendant's sister, at the scene and that Ms. Ayers was upset and had been crying. He identified photographs of Ms. Ayers's cell phone, which showed an outgoing call to the Defendant at 11:21 a.m. and an incoming call from the Defendant at 1:05 p.m. on the day of the shooting.

Candice Ayers testified that she spoke with the Defendant twice on the day of the shooting. Ms. Ayers called the Defendant during Ms. Ayers's morning drive to work, and she received a call from the Defendant later that afternoon. During the first conversation, the Defendant discussed her children and her relationship with the victim. The Defendant was upset and told Ms. Ayers that she and the victim had argued the previous night and the morning of the shooting, although the Defendant did not state the subject of the argument. Ms. Ayers said the Defendant admitted during their second conversation that she shot the victim.

On cross-examination, Ms. Ayers testified that during the first conversation, the Defendant did not mention any violence from the victim. She said that during the second conversation, the Defendant mentioned the physical altercation with the victim.

Upon this evidence, the Defendant was convicted of voluntary manslaughter, false report, and employing a firearm during the commission of a dangerous felony. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions for voluntary manslaughter and false report to a police officer. She does not challenge her firearm conviction on this basis. The State argues that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier

of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Whether an act is committed under adequate provocation is a question of fact for the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). As relevant here, a person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a) (2014). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). In the context of voluntary manslaughter, intent is shown if the defendant has the desire to cause the victim's death or acts with an awareness that her conduct is reasonably certain to cause the victim's death. *See State v. Page*, 81 S.W.3d 781, 790-93 (Tenn. Crim. App. 2002).

It is a crime, in relevant part, "for any person to [i]nitiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that [t]he offense or incident reported did not occur[.]" T.C.A. § 39-16-502(a)(1)(A). A statement is defined as "any representation of fact." *Id*. § 39-16-501(2) (2014). The statute "encompasses not only reports volunteered or initiated by individuals to law enforcement . . . , but also false statements made in response to 'a legitimate inquiry' by a law enforcement officer." *State v. Walter Lee Hicks, Jr.*, No. M2013-01410-CCA-R3-CD, 2014 WL 2902277, at *7 n.3 (Tenn. Crim. App. June 26, 2014), *perm. app. denied* (Tenn. Oct. 22, 2014).

In the light most favorable to the State, the record reflects that at the trial, the Defendant admitted fatally shooting the victim after a physical altercation. The Defendant and the victim argued about her reluctance to sell drugs for the victim and the victim's refusal to take out the garbage. The victim insulted the Defendant's older son, and Ms. Stewart testified that the victim called the Defendant degrading names. The verbal argument escalated into a physical altercation in which the victim hit the Defendant in the mouth and the head, knocking the Defendant to the floor, and kicked her after she fell. Photographs of the Defendant taken on the day of the shooting provide corroboration of the physical altercation, and Mr. Jones and Ms. Stewart testified that the Defendant and the victim

-13-

engaged in a physical altercation minutes before the shooting. Likewise, Ms. Stewart testified that the Defendant's lip was bleeding after the assault.

After the physical altercation, the Defendant testified that she felt humiliated, hurt, and angry and that she picked up the victim's loaded gun from the bedroom. The Defendant said that she was not thinking clearly after the assault because she could only think about the abuse she and her older son had endured from the victim during their seven-year relationship. The Defendant thought of the victim's controlling behavior, which included preventing her from having friends and family visit her home. Furthermore, the Defendant thought of the victim's broken promises of never laying his hands on her again. She recalled that three weeks before the shooting, the victim told their son to go to his room because the Defendant was going "to get her a-- beat tonight."

As the Defendant walked down the street behind the victim and Mr. Jones and while carrying a gun, she yelled at the victim. Mr. Jones testified that the Defendant acted "crazy" and yelled at the victim that he had knocked out her tooth. Mr. Randle and Mr. Franklin testified that the Defendant screamed at the victim that he had hit her for the last time and that the Defendant was upset and agitated. The Defendant testified that as she walked behind the victim, she thought about how much she loved the victim and her anger that she had been physically abused again and in front of their child. The Defendant said that she only wanted to know why the victim had broken his promise not to hit her again and that she realized she had endured enough abuse. She stated that when she pulled out the gun, she was thinking of all the times the victim physically abused her, the embarrassment she felt because other people had witnessed the abuse, and the anger she felt from the victim's verbally and physically abusing her older son. The Defendant said that she saw red and stars when she pulled out the gun, that she was not thinking clearly, and that she did not intend to kill the victim.

We conclude that the evidence is sufficient to support the jury's verdict. The Defendant intentionally engaged in the conduct leading to the victim's fatal injury. The Defendant's grabbing a gun, following the victim down the street, and firing the gun after it misfired shows her conscious objective to engage in the conduct that caused the victim's death. Further, the evidence also reflects that the Defendant was aware her use of the gun was reasonably certain to cause the victim's death. She knew the gun was loaded, pointed it at the victim, and fired it. Other notable factors that evidence an intent to cause the victim's death include the Defendant's arming herself with a gun after the victim left the house, seeking the unarmed victim who had removed himself from the house where the physical altercation occurred, telling Mr. Jones to move out of the way before shooting the victim, and pulling the trigger a second time after the gun misfired. Likewise, the victim's physically abusing the Defendant and her emotional reaction to the physical altercation

-14-

before the shooting provides sufficient evidence for the jury to have found that the Defendant acted pursuant to adequate provocation to act in an irrational manner in killing the victim. The Defendant is not entitled to relief on this basis.

Relative to the false report conviction, the record reflects that when Officer Evans arrived at the scene, the Defendant ran down the street and screamed the victim had been hit by a car. The Defendant testified that she told the police that the victim had been hit by a car because she was scared of what she had done. Her statements were unsolicited by Officer Evans. Officer Evans spoke to witnesses at the scene, and they provided statements inconsistent with the victim's being hit by a car. When Officer Evans later questioned the Defendant, she admitted shooting the victim and told the officer where the gun was located.

We conclude that the evidence is sufficient to support the Defendant's false report conviction. Our supreme court has concluded after reviewing the legislative history of subsection (a)(1)(A), the basis for the Defendant's conviction, that the intent was to "proscribe[] the initiation of a false statement or report to a law enforcement officer[.]" *State v. Smith*, 436 S.W.3d 751, 770 (Tenn. 2014); *see* T.C.A. § 39-16-502(a)(1)(A). Although the Defendant argues that the evidence is insufficient because her statement that the victim had been hit by a car was not made in response to a legitimate inquiry by a police officer, the Defendant was not indicted or convicted pursuant to subsection (a)(2), which would have required the State to prove beyond a reasonable doubt that the Defendant's false statement was made in response to a legitimate law enforcement inquiry. Instead the Defendant was indicted pursuant to subsection (a)(1)(A), which required proof that the Defendant initiated a false statement to a police officer when she knew the incident she reported did not occur. *See Walter Lee Hicks, Jr.*, 2014 WL 2902277, at *7. The evidence reflects that the Defendant told Officer Evans that the victim had been struck by a car. The Defendant knew this was false because she shot the victim, ran home, disposed of the revolver, changed her clothes, and returned to the scene. The Defendant is not entitled to relief on this basis.

## II

### Sufficiency of the Indictment Relative to the Firearm Conviction

The Defendant contends that her conviction for employing a firearm during the commission of a dangerous felony should be dismissed because the indictment did not specify the alleged underlying dangerous felony and because she was not indicted for any dangerous felony specified in Tennessee Code Annotated section 39-17-1324(i)(1). The State responds that the Defendant was provided sufficient notice of the underlying dangerous felony because voluntary manslaughter is the only lesser included offense of first degree murder that is an enumerated dangerous felony.

-15-

Our federal and state constitutions require a criminal defendant be provided information of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Generally, an indictment is valid if it contains adequate information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997) (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Furthermore, Tennessee Code Annotated section 40-13-202 requires an indictment to "state the facts constituting the offense in ordinary and concise language . . . in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202 (2014). "However, this [c]ourt has recognized that an indictment that cites Tennessee Code Annotated section 39-17-1324, but does not name the specific predicate felony, may not be sufficient to provide notice of the crime charged because of the multiple possible predicate felonies listed in the statute." *State v. Willie Duncan*, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *6 (Tenn. Crim. App. Aug. 27, 2014) (citing *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *21 (Tenn. Crim. App. May 10, 2013), *perm. app. denied* (Tenn. Oct. 17, 2013)), *perm. app. granted* (Tenn. Feb. 13, 2015).[1]

It is a crime "to employ a firearm during the [c]ommission of a dangerous felony[.]" T.C.A. § 39-17-1324(b)(1). Dangerous felonies are delineated by our statutes and at the time of the shooting, the felonies included attempt to commit first degree murder, attempt to commit second degree murder, voluntary manslaughter, carjacking, especially aggravated kidnapping, aggravated kidnapping, especially aggravated burglary, aggravated burglary, especially aggravated stalking, aggravated stalking, initiating the process to manufacture methamphetamine, the sale, manufacture, distribution, or possession with the intent to sell, manufacture, or distribute a controlled substance, and any attempt to commit a dangerous felony. *Id*. § (i)(1)(A)-(M) (2010). Although the statute requires that a charge of violating subsection (b) "be pled in a separate count of the indictment . . . and tried before the same jury and at the same time as the dangerous felony," the statute is silent relative to whether the underlying dangerous felony must be identified in the indictment. *Id*. § (d); *see Demeko Gerard Duckworth*, 2013 WL 1933085, at *21. In the context of sufficiency of an indictment, the appellate courts, however, are not permitted to examine the evidence at the

---

[1] The Tennessee Supreme Court has granted the State's application for permission to appeal, which focuses, in relevant part, on whether the State must specify an enumerated felony in an indictment count charging a violation of Code section 39-17-1324. *See State v. Willie Duncan*, No. W2013-02554-SC-R11-CD (Tenn. Feb. 3, 2015) (order).

"trial to determine which felonies may be disqualified under section 1324(c)." *Willie Duncan*, 2014 WL 4243746, at *9.

In *Demeko Gerard Duckworth*, the defendant was indicted for two counts of first degree murder, one count of attempted first degree murder, and one count of employing a firearm during the commission of a dangerous felony alleged to have occurred in July 2010. The indictment count relative to the firearm violation did not specify an underlying dangerous felony. This court stated, "Generally, an indictment for a violation of Code section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged. This is so even when the indictment . . . tracks the statutory language of Code section 39-17-1324 and names the statute[.]" *Demeko Gerard Duckworth*, 2013 WL 1933085, at *21. This court explained that failure to identify the underlying dangerous felony provided inadequate notice because Code section 39-17-1324 identifies multiple dangerous felonies. *Id.* This court concluded that the indictment count alleging a violation of employing a firearm during the commission of a dangerous felony, viewed in isolation, was invalid because it failed to identify the underlying dangerous felony from Code section 39-17-1324. *Id.* However, this court concluded that the indictment count was "saved" because only one of the three remaining counts in the indictment, attempted first degree murder, charged an offense that qualified as a dangerous felony for purposes of the statute. *Id.*; *see* T.C.A. § 39-17-1324(i)(1)(A) (2010) (showing attempted first degree murder was a dangerous felony at the time of the offense).

Likewise, this court reached a similar conclusion in *State v. Rhakim Martin*, No. W2013-02013-CCA-R3-CD, 2015 WL 555470, at *7-8 (Tenn. Crim. App. Feb. 10, 2015), *perm. app. granted* (Tenn. May 15, 2015).[2] In the two-count indictment, the defendant was charged with carjacking and employing a firearm during the commission of a dangerous felony. This court concluded that although a dangerous felony might not be named in the count charging employing a firearm during the commission of a dangerous felony, a defendant is provided adequate notice of the applicable dangerous felony when the remaining counts in the indictment charge only one underlying dangerous felony as specified in Code section 39-17-1324(i). *Id.* at *8; *see* T.C.A. § 39-17-1324(i)(1)(D) (2010) (showing that carjacking was a dangerous felony at the time of the offense).

---

[2] The order granting the defendant's application for permission to appeal states that our supreme court is "particularly interested" in "whether the failure to name the predicate felony of the firearm offense voids" the respective count in the indictment. *See State v. Rhakim Martin*, No. W2013-02013-SC-R11-CD (Tenn. May 15, 2015) (order).

In *State v. Eric Williams*, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389 (Tenn. Crim. App. Mar. 27, 2015), *no perm app. filed*, the two-count indictment charged the defendant with first degree premeditated murder and employing a firearm during the commission of a dangerous felony. Although the jury acquitted the defendant of the firearm charge and no issue was raised on appeal, this court noted that the prosecution failed to name an underlying dangerous felony in the indictment relative to the firearm violation and that first degree murder was not an enumerated felony in Code section 39-17-1324(i)(1). *Id.* at *1 n.1. The trial court charged the jury that it could find the defendant guilty of the firearm violation only if it found him guilty of voluntary manslaughter as a lesser included offense of first degree murder. Although this court noted that voluntary manslaughter was an enumerated dangerous felony, it concluded that the indictment count relative to the firearm violation was void for lack of notice because it failed to provide the defendant with adequate notice of the charge against him. *Id.* (citing *Demeko Gerard Duckworth*, 2013 WL 1933085, at *19-22); *see* T.C.A. § 39-17-1324(i)(1) (Supp. 2009) (reflecting that first degree murder was not a dangerous felony at the time of the offense in December 2009).

By contrast, in *State v. Alvin Brewer and Patrick Boyland*, Nos. W2012-02281-CCA-R3-CD and W2012-02282-CCA-R3-CD, 2014 WL 1669807, at *28 (Tenn. Crim. App. Apr. 24, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014), this court concluded that the defendants were not provided adequate notice of the underlying dangerous felony relative to the employing a firearm during the commission of a dangerous felony violation because the indictment did not identify the dangerous felony and because the defendants were also indicted for especially aggravated kidnapping and aggravated burglary, both of which were enumerated dangerous felonies at the time of the offenses in late 2010. *See* T.C.A. § 39-17-1324(i)(1)(E), (H) (2010). As a result, when the prosecution fails to identify the underlying dangerous felony in an indictment relative to a violation of Code section 39-17-1324 and when a defendant is indicted for multiple offenses that are also dangerous felonies as defined in Code section 39-17-1324, the indictment count relative to the firearm violation is insufficient because it fails to provide notice of which offense the State is relying upon as the dangerous felony. *Alvin Brewer and Patrick Boyland*, 2014 WL 1669807, at *28 (citing *State v. Larry Jereller Alston, et al.*, No. E2012-00431-CCA-R3-CD, 2013 WL 2382589 (Tenn. Crim. App. May 30, 2013)); *see Willie Duncan*, 2014 WL 4243746, at *8 (concluding that the defendant was not provided adequate notice of the dangerous felony when the indictment failed to identify the dangerous felony and when the indictment also charged the defendant with aggravated burglary and especially aggravated kidnapping, both of which were dangerous felonies at the time of the offense in December 2011). This court noted that its holding was not based on the premise that a defendant might have to prepare defenses to multiple offenses but that the rationale stemmed from the notion an indictment that fails "to fully state a crime," renders all subsequent proceedings void. *Alvin Brewer and Patrick*

*Boyland*, 2014 WL 1669807, at \*29 (citing *State v. Perkinson*, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992)).

In the present case, the State argues that because voluntary manslaughter is a lesser included offense of first degree murder and is an enumerated dangerous felony in Code section 39-17-1324, the Defendant received adequate notice of the underlying dangerous felony. *See* T.C.A. § 40-18-110(g)(2) (2012) (stating voluntary manslaughter is a lesser included offense of first degree murder). The State correctly argues that generally, a defendant receives adequate notice that he or she might be convicted of a lesser included offense of the indicted offense. *See State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (stating that a defendant is not entitled to distinct notice that she might be convicted of a lesser included offense). We agree that the Defendant was provided adequate notice that she might face conviction for voluntary manslaughter as a lesser included offense of the indicted first degree murder charge based on the evidence presented at the trial. We note, though, that the issue in the present appeal is framed in the context of sufficiency of the indictment for employing a firearm during the commission of a dangerous felony, not sufficiency of the evidence. The State's argument is in stark contrast to the notion that an indictment which fails to state a criminal violation fully renders all subsequent proceedings void. *See Alvin Brewer and Patrick Boyland*, 2014 WL 1669807, at \*29 (citing *Perkinson*, 867 S.W.2d at 5).

In *State v. Shawn Thompson*, No. M2013-01274-CCA-R3-CD, 2014 WL 2609535, at \*5 (Tenn. Crim. App. June 11, 2014), *no perm. app. filed*, the defendant was indicted, in relevant part, for attempted first degree murder for an incident occurring in June 2010, at which time attempted first degree murder was an enumerated dangerous felony in Code section 39-17-1324. *See* T.C.A. § 39-17-1324(i)(1)(A) (Supp. 2009). The indictment specified that the underlying dangerous felony relative to a violation of Code section 39-17-1324 was attempted first degree murder. The jury, however, convicted the defendant of the lesser included offense of attempted voluntary manslaughter, which was also an enumerated dangerous felony. *See id.* § 39-17-1324(i)(1)(C), (M) (Supp. 2009). This court concluded that no variance existed between the indictment charging attempted first degree murder and the proof at trial resulting in a conviction for attempted voluntary manslaughter because "[a]ttempted voluntary manslaughter is a lesser-included offense of attempted first degree murder." *Shawn Thompson*, 2014 WL 2609535, at \*6; *see State v. Antoine Perrier*, No. W2011-02327-CCA-MR3-CD, 2013 WL 1189475, at \*10 (Tenn. Crim. App. Mar. 22, 2013) (upholding convictions for employing a firearm during the commission of a dangerous felony and attempted voluntary manslaughter, a lesser included offense of the indicted offense attempted second degree murder, when attempted second degree murder and attempted voluntary manslaughter were enumerated dangerous felonies at the time of the offense in February 2010), *perm. app. dismissed* (Tenn. Feb. 7, 2014); *see also State v. Andrianne*

*Kiser*, No. W2011-01937-CCA-R3-CD, 2012 WL 6115087 (Tenn. Crim. App. Dec. 10, 2012) (upholding convictions for employing a firearm during the commission of a dangerous felony and attempted voluntary manslaughter, a lesser included offense of the indicted offense attempted second degree murder, when attempted second degree murder and attempted voluntary manslaughter were enumerated dangerous felonies at the time of the offense in April 2010), *perm. app. denied* (Tenn. May 7, 2013).

We conclude that in the context of sufficiency of the indictment, the prosecution's failure to identify an underlying dangerous felony in the indictment count relative to a violation of Code section 39-17-1324 provided the Defendant inadequate notice of the crime charged. *See Demeko Gerard Duckworth*, 2013 WL 1933085, at *21. The statute contains multiple dangerous felony offenses, and the indictment count contained no additional information relative to the underlying dangerous felony upon which the State would rely at the trial. The only remaining counts in the indictment were first degree murder and false report, which were not enumerated dangerous felonies. The indictment count relative to Code section 39-17-1324 is insufficient because the remaining counts in the indictment did not allege a violation of any enumerated dangerous felony. *See id.*; *see also* T.C.A. § 39-17-1324(d). The common thread between the cases we have cited is that although an indictment count relative to a violation of Code section 39-17-1324 might not specify the dangerous felony relied upon by the State, a single additional count in the indictment charging an offense that is also an enumerated dangerous felony provides a defendant adequate notice, rendering an indictment sufficient. In other words, it is the separately charged dangerous felony that saves the indictment count relative to a violation of Code section 39-17-1324.

Although our courts have upheld convictions for employing a firearm during the commission of a dangerous felony when the separate indicted offense was not an enumerated dangerous felony in Code section 39-17-1324, those cases did not involve an issue related to sufficiency of the indictment. For example, in *State v. Lorenzo McLemore, III*, No. M2010-01189-CCA-R3-CD, 2012 WL 695325, at *10-12 (Tenn. Crim. App. Feb. 6, 2012), *perm. app. denied* (Tenn. May 16, 2012), the defendant was indicted, in relevant part, for three counts of attempted first degree murder and one count each of especially aggravated burglary and employing a firearm during the commission of a dangerous felony. We note that at the time of the offenses, attempted first degree murder was not an enumerated dangerous felony but that especially aggravated burglary was an enumerated dangerous felony. *See* T.C.A. § 39-17-1324(i)(1)(F) (Supp. 2007). The defendant was convicted of three counts of the lesser included offense attempted voluntary manslaughter. A mistrial was declared relative to the especially aggravated burglary, and the jury convicted the defendant of the firearm violation in relation to the attempted voluntary manslaughter convictions. *See id.* § (i)(1)(B), (L) (Supp. 2007) (showing attempted voluntary manslaughter was a dangerous felony at the time of the offense). The issue on appeal was framed in the context of

sufficiency of the evidence, and this court concluded that the evidence was sufficient to sustain a conviction for the firearm violation during the commission of an attempted voluntary manslaughter. *Lorenzo McLemore, III*, 2012 WL 695325, at *8.

In *State v. Darquan Swift*, No. W2011-02439-CCA-R3-CD, 2013 WL 3291884, at *10 (Tenn. Crim. App. June 24, 2013), *perm. app. denied* (Tenn. Nov. 14, 2013), this court considered the defendant's argument that Code section 39-17-1324 generally could not be applied to lesser included offenses. The defendant was indicted for attempted first degree murder, especially aggravated robbery, attempted especially aggravated robbery, aggravated robbery, attempted aggravated robbery, and employing a firearm during the commission of a dangerous felony. We note that as in the present case, at the time of the offenses in *Swift* on July 20, 2009, none of the indicted offenses were enumerated dangerous felonies. *See* T.C.A. § 39-17-1324(i)(1) (Supp. 2008). Relative to the attempted first degree murder charge, the defendant was convicted of the lesser included offense of attempted second degree murder, which was an enumerated dangerous felony and the basis for the firearm violation. *See id.* § (i)(1)(A) (Supp. 2008). Raised in the context of the prohibition against ex post facto application of laws, the defendant argued the prosecution could not rely on the lesser included offense of which he was convicted to satisfy Code section 39-17-1324 because the indicted offense of attempted first degree murder was not an enumerated dangerous felony at the time of the offenses. This court affirmed the defendant's firearm conviction and stated that the defendant's contention was based on the theory that Code section 39-17-1324 "is an 'enhancement' statute that 'change[s] punishment or inflict[s] greater punishment than the law annexed to the crime when committed.'" *Darquan Swift*, 2013 WL 3291884, at *11. This court concluded that the claim was without merit. *Id.*

In any event, *Demeko Gerard Duckworth*, *Rhakim Martin*, and *Eric Williams* reflect this court's concern with the prosecution's practice to indict a defendant for a violation of Code section 39-17-1324 without identifying the underlying dangerous felony and without providing any indication of which dangerous felony it will rely upon at a trial. In the context of sufficiency of an indictment, we are not permitted to examine the evidence presented at the trial to determine what offense might apply to the firearm violation. *See Willie Duncan*, 2014 WL 4243746, at *9. Our sole concern is whether an indictment provides a defendant with adequate notice of the charges.

In the present case, the State's failure to identify the underlying dangerous felony in the indictment and its failure to charge an offense that was also a dangerous felony fail to provide adequate notice relative to the indicted firearm violation. Allowing the State to indict a defendant for a non-enumerated dangerous felony offense and to rely on that offense as a basis for obtaining a conviction for a violation of Code section 39-17-1324 in the event a jury convicts a defendant of an applicable lesser included offense deprives a defendant of

adequate notice of the alleged offense. *See Demeko Gerard Duckworth*, 2013 WL 1933085, at *21; *see also Eric Williams*, 2015 WL 1453389, at *1 n.1. When the State chooses to indict for a violation of Code section 39-17-1324 without naming an enumerated dangerous felony and chooses not to indict separately for an enumerated dangerous felony, the indictment fails to provide adequate notice of the crime charged relative to Code section 39-17-1324. *See Alvin Brewer and Patrick Boyland*, 2014 WL 1669807, at *29 (citing *Perkinson*, 867 S.W.2d at 5). As a result, we reverse the Defendant's conviction for employing a firearm during the commission of a dangerous felony, vacate the conviction, and dismiss the charge.

## III

### Evidence of Prior Abuse

The Defendant contends that the trial court erred by excluding proof of the victim's abusing the Defendant and her older son. She argues that her right to a fair trial was denied because the victim's abuse contributed to her state of mind at the time of the shooting and that the evidence was necessary for the jury to determine whether it was reasonable for her "to be provoked or to feel that her use of force was necessary." The State responds that the evidence is irrelevant and inadmissible character evidence.

In a jury-out hearing before the State rested its case-in-chief, defense counsel requested permission to present evidence during his case-in-chief of previous instances of physical abuse by the victim in an effort to establish the Defendant's state of mind at the time of the shooting. The trial court stated that counsel was attempting to present evidence of specific instances of conduct pursuant to Tennessee Rule of Evidence 608 in an effort to establish the victim's character. The court questioned whether witnesses who might have seen an incident of physical abuse months before the shooting could show the Defendant's state of mind at the time of the shooting. The court stated that the Defendant was the only witness who could establish her state of mind. Counsel argued, though, that witnesses could testify relative to what they saw and that the Defendant could testify how those incidents affected her state of mind.

The trial court found that any previous incident of abuse was irrelevant to the case because the Defendant was not presenting a battered wife syndrome defense. Defense counsel reminded the court that the Defendant's state of mind and whether she acted in the heat of passion were relevant to self-defense and to voluntary manslaughter. The court agreed but found that "under the relevant character evidence[,] it's not admissible proof conduct." The court reasoned that counsel was attempting to establish specific instances of conduct by the victim and that "it's not just a free range . . . to start calling witnesses to say

any bad thing they think . . . or that they've heard about the deceased." Counsel noted for the court that the evidence would be limited to the abuse the Defendant suffered at the hands of the victim, which led to her state of mind during the final incident of abuse on the day of the shooting. The court stated that it would permit counsel to present the evidence in the form of an offer of proof if counsel could convince the court that the evidence of the victim's other crimes, wrongs, or acts was relevant.

At a later jury-out hearing, defense counsel argued that the Defendant reasonably feared the victim, that they were in an abusive relationship, that many previous incidents of abuse occurred, and that one incident occurred on the day of the shooting. Counsel argued the defense was permitted to present evidence of the victim's character related to this point pursuant to Tennessee Rule of Evidence 404(a). The trial court interjected that based upon the State's proof, the court was finding that self-defense did not apply because no reasonable juror could find the Defendant was in fear of imminent danger at the time of the shooting. The court noted that the Defendant's carrying a gun in public was unlawful.

The trial court stated that it would permit defense counsel to present evidence as long as the incidents were not too remote. The court said the evidence was relevant to the Defendant's mental state at the time of the shooting and whether she acted with premeditation or in the heat of passion. The court also found, though, that incidents of abuse that occurred "significantly before" the shooting had no bearing on her state of mind at the time of the shooting. Counsel again argued he was permitted to present such evidence pursuant to Rule 404(a)(2). He stated that he was not offering evidence of prior abuse to show the victim's propensity for abuse but rather to show the effect of the abuse on the Defendant and the Defendant's reaching her breaking point on the day of the shooting. Although the court found that the Defendant could testify about her reaching her breaking point, third-party witnesses could not testify that they witnessed a particular incident of abuse on one occasion and that the Defendant reached her breaking point on the day of the shooting. Counsel noted abuse dating to five years before the shooting, and the court permitted counsel to present witnesses in the form of an offer of proof.

Paul Thompkins testified that he was the Defendant's supervisor at Kentucky Fried Chicken restaurant for about two years. He came to know the Defendant well during her employment and said the victim came to the restaurant on one occasion and cursed the Defendant. He said the argument was verbal and did not escalate into a physical confrontation. He said similar incidents occurred four or five times, although he only witnessed three incidents. He saw bruises and scratches on the Defendant, and he asked her what occurred. He said the Defendant replied, "[T]hey had been in it."

Mr. Thompkins testified that on one occasion, the victim walked inside the restaurant and cursed the Defendant from the counter. Mr. Thompkins overheard the cursing from his office, and he asked the victim to leave. The victim began cursing Mr. Thompkins, and Mr. Thompkins threatened to call the police if the victim did not leave the premises. Mr. Thompkins recalled the victim's walking to the parking lot and the Defendant's requesting permission to talk to the victim outside. He said that he did not see any physical injuries to the Defendant when she returned to work but that the Defendant was distraught. He recalled the Defendant's general demeanor was depressed after an incident. He said the Defendant "sometimes" seemed scared of the victim.

On cross-examination, Mr. Thompkins testified that the Defendant worked for him when she was age sixteen or seventeen. He did not know the Defendant's age but agreed she was probably in her mid-twenties at the time of the trial. He denied the Defendant cursed the victim, and he agreed he did not know what occurred when the victim and the Defendant were in the restaurant parking lot. He agreed he did not witness the incident that resulted in the Defendant's scratches and bruises.

The trial court found pursuant to Tennessee Rule of Evidence 404 that the incident was "vague." The court noted that the testimony would not be offered to show the victim was the first aggressor and found that the testimony did not show any relevant trait other than the Defendant and the victim argued when the Defendant was age sixteen or seventeen, to which the Defendant had already testified. The court found the testimony irrelevant.

The Defendant's older son testified that he was age ten and that the victim was his stepfather. He had a poor relationship with the victim because the victim was "mean" and struck him frequently. He said the victim last abused him sometime before 2012. He admitted he had issues wetting the bed at night and said the victim "whoop[ed]" him, which resulted in bruises. He said the victim prevented him from drinking on occasion because of his issues. He said the victim cursed him.

Defense counsel told the trial court that the Defendant's older son's testimony would show the Defendant's state of mind. Counsel noted that during the Defendant's testimony, she claimed the victim's verbal and physical abuse of her older son provoked her on the day of the shooting. Counsel noted the history of abuse and argued it was relevant to whether the Defendant acted with adequate provocation. The court found that the Defendant's older son's testimony was "not specific enough to be a specific incident of conduct." The court found that the Defendant's older son generally characterized the victim as mean and that the Defendant did not testify she witnessed any incident between her older son and the victim. The court found that the Defendant's older son's testimony could not establish the Defendant's state of mind and noted that none of the evidence presented at that point in the

-24-

trial disputed the Defendant's testimony relative to the victim's abuse toward her and her older son. The court stated that the trial was not related to a previous domestic abuse allegation and that the only relevant matter was the Defendant's state of mind. The court found that the testimony was irrelevant.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

The Defendant's theories of the case were that she acted in self-defense or that "at most" she was guilty of voluntary manslaughter. As a result, her state of mind at the time of the shooting was relevant to determining whether the Defendant intentionally killed the victim with premeditation, knowingly killed the victim without premeditation, or killed the victim in the heat of passion under adequate provocation. *See* Tenn. R. Evid. 401. The Defendant testified that the victim's previous domestic abuse against her and her older son was her dominating thought when she picked up the loaded gun and followed the victim down the street. She was angry, humiliated, and hurt by the victim's broken promises that he would never again abuse her or her son. As a result, testimony about the victim's previous violent conduct toward the Defendant was relevant. Although we agree with the trial court's finding that the evidence did not support the Defendant's acting in self-defense, the evidence generally supported her acting in the heat of passion under adequate provocation, rendering her state of mind regarding the prior abuse relevant based on the Defendant's testimony. *See State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992) (stating a defendant's "state of mind is crucial to the establishment of the elements of the offense"). However, this does not end our inquiry because relevant evidence is not admissible automatically.

Tennessee Rule of Evidence 404(a)(2) states generally, "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [i]n a criminal case, . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused[.]" Generally, this provision is used to present evidence of the victim's previous history of violence to show that the victim was the first aggressor. *See State v. Ruane*, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* §

4.04[5][f] (6th ed. 2011). Additionally, when evidence of a victim's character trait for violence is admitted to show the victim was the initial aggressor, substantive evidence may be established only by reputation or opinion testimony. Tenn. R. Evid. 405(a). It is only during cross-examination that specific instances of conduct are admissible. *Id*.

Defense counsel repeatedly told the trial court that the intended purpose of the evidence was not to show the victim was the first aggressor or acted in conformity with his propensity for domestic abuse but to show the Defendant's state of mind at the time of the shooting. As a result, Rule 404(a)(2) is inapplicable. *See* Cohen, § 4.04[7][b] (stating that "[s]ince the accused is proving his or her own fear rather than an action by the victim, Rule 404(a), which deals with character evidence to prove action in conformity with that character, does not apply"). We note that Rule 404(b) is also inapplicable because it applies to other crimes, wrongs, and acts of the accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). "Acts of anyone else are analyzed under Rule 401 rather than 404(b)." Cohen, § 4.04[7][b]. We note that although the court mentioned Rule 608 during the jury-out hearings as a basis for excluding the evidence, this rule applies to testifying witnesses. As a result, Rule 608 is also inapplicable in the present case.

Although we have concluded that evidence related to the victim's prior abuse was relevant to establishing the Defendant's state of mind at the time of the shooting, the trial court did not abuse its discretion by excluding the evidence proffered by the Defendant. The Defendant was permitted to testify generally about incidents of prior abuse and the circumstances of her relationship with the victim. This evidence was used to establish her state of mind and was properly admitted. Mr. Thompkins's testimony, though, surrounded an event several years before the shooting when the Defendant was age sixteen or seventeen, rendering the incident too remote in time. Although the incident involved a verbal exchange between the Defendant and the victim, Mr. Thompkins did not witness any physical abuse during the incident or at any time during the Defendant's employment. As a result, the relevancy of his testimony was limited. Likewise, Tennessee Rule of Evidence 403 provided a basis for excluding the evidence. The testimony held the potential of presenting cumulative evidence in the nature of general verbal abuse by the victim to which the Defendant had already testified.

Likewise, although the Defendant's older son's testimony was relevant to the Defendant's state of mind regarding the victim's abuse toward her older son, his testimony provided no additional detail about his relationship with the victim. The Defendant testified about the victim's calling her older son slow and verbally abusing him because he struggled with bed wetting. The Defendant also testified that the victim physically abused her older son. As a result, this evidence also created the risk of presenting cumulative evidence and wasting time pursuant to Rule 403.

In any event, the Defendant's testimony adequately presented the jury with information relative to the victim's prior abuse against her and her son, and the jury's verdict reflects that it credited her testimony by finding she acted under adequate provocation at the time of the shooting. We note that defense counsel's argument to the trial court for the admission of the testimony was, in part, to accomplish this goal. The court did not abuse its discretion by excluding the testimony. The Defendant is not entitled to relief on this basis.

## IV

## Expert Medical Testimony

The Defendant contends that the trial court erred by allowing a medical examiner who did not perform the victim's autopsy to testify about the autopsy results and by admitting the autopsy report in evidence. She argues that Dr. Laboy's testimony and admission of the autopsy report violated her constitutional rights to confront and cross-examine the medical examiner who performed the autopsy and prepared the report. The State contends that the court properly allowed Dr. Laboy to testify about the autopsy results because he offered his independent expert opinions, using the report as a basis for his opinions.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court concluded that the Confrontation Clause permits the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." A statement is testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id*. at 51-52 (internal quotation marks and citation omitted); *see Davis v. Washington*, 547 U.S. 813, 822 (2006). In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-55; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). However, the Confrontation Clause is not implicated when testimonial statements are not used to show the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9.

In the context of expert witnesses and reports, the Supreme Court concluded that the Confrontation Clause was violated when the prosecution introduced the forensic analysis report of the defendant's blood alcohol concentration through an analyst who did not conduct or observe the analysis performed. *Bullcoming v. New Mexico*, — U.S. —, — , 131 S. Ct. 2705, 2709 (2011). The Court stated that the Confrontation Clause "does not tolerate

dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id*. at 2716. The Court stated that in order for an analysis report to be admissible, the analyst who performed the analysis must be unavailable and the defendant must have had a prior opportunity to cross-examine the analyst. *Id*.; *see Melendez-Diaz*, 557 U.S. at 311. We note that *Bullcoming* did not involve a scenario in which the testifying analyst was asked to render an independent expert opinion relative to the "underlying testimonial reports that were not themselves admitted into evidence." *Id*. at 2722 (Sotomayor, J., concurring).

In 2012, the Supreme Court considered whether the Confrontation Clause precludes an expert witness from providing an opinion based upon information contained in a DNA laboratory report, although the expert was not involved in the analysis or preparation of the report. *Williams v. Illinois*, — U.S. —, 132 S. Ct. 2221 (2012). The plurality concluded that the DNA report at issue was non-testimonial because it was not prepared for "the primary purpose of accusing a targeted individual." *Id*. at 2243. At the time the report was prepared, no suspects had been identified, and as a result, the Court concluded that the primary purpose of the report was "to catch a dangerous rapist who was still at large," not "to accuse [the defendant] or to create evidence for use at trial." *Id*. However, four justices rejected the plurality's "accusation test" for various reasons and concluded that the report was testimonial because it was compiled to show "'some fact' in a criminal proceeding," which was the rapist's identity. *Id*. at 2266-67 (Kagan, J., dissenting) (quoting *Bullcoming*, 131 S. Ct. at 2717). Justice Kagan, joined by Justices Scalia, Ginsburg, and Sotomayor, concluded that the a defendant's confrontation rights are violated when an expert who does not perform the analysis or compile the report is permitted to testify about its contents. *Id*. at 2268.

In reviewing *Williams*, the Tennessee Supreme Court concluded that no clear test exists for determining whether the use of forensic evidence violates a defendant's confrontation rights. *State v. Dotson*, 450 S.W.3d 1, 69-70 (Tenn. 2014). In *Dotson*, the defendant argued that the admission of testimony from a forensic pathologist who did not perform the victims' autopsies and admission of the reports prepared by a medical examiner who did not testify at the trial violated his confrontation rights. After discussing the various conclusions courts had made regarding autopsy reports and expert testimony from medical examiners who did not perform the autopsies, our supreme court stated, "We need not decide in this case whether autopsy reports are testimonial or whether a medical examiner may testify about an autopsy report produced by another pathologist who does not testify at trial." *Id*. at 72. Because the defendant did not object during the trial to the admission of the autopsy report and failed to raise the issue in his motion for a new trial, our supreme court concluded that plain error relief was not warranted "[g]iven the uncertainty that has existed in Confrontation Clause jurisprudence since *Crawford*, and in particular the lack of clarity

regarding expert reports and testimony, which was . . . exacerbated by the splintered decision in *Williams*[.]" *Id.*

Although the Tennessee Supreme Court has granted the defendant's application for permission to appeal in *State v. Thomas Lee Hutchison*, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240 (Tenn. Crim. App. Apr. 11, 2014), *perm. app. granted* (Tenn. Oct. 20, 2014), we nonetheless find the Court of Criminal Appeals opinion instructive on this issue. The defendant in *Hutchison* argued that his confrontation rights were violated by the admission of the autopsy report through a medical examiner who did not perform the autopsy. Utilizing the primary purpose test, a majority of this court concluded that although the defendant was in police custody at the time the autopsy was performed, the purpose of the autopsy "was to identify the injuries sustained by the victim and determine his cause of death." *Id*. at *30. Likewise, the majority concluded that the autopsy "was not 'accusing a targeted individual of engaging in criminal conduct.'" *Id.* (quoting *Williams*, 132 S. Ct. at 2242). As a result, the majority concluded that the autopsy report was non-testimonial and that its admission did not violate the Confrontation Clause. *Id*.

The dissent, however, concluded based upon the facts specific to the case that the Confrontation Clause "was implicated when the autopsy report was admitted through the testimony of a medical examiner who did not perform the autopsy." *Id*. at *41 (Tipton, P.J., concurring and dissenting). At the time the victim's body was discovered by law enforcement, "his pants were pulled down, he was lying face down on the floor, and blood spatter surrounded him." *Id*. The crime scene showed that the victim suffered blunt force trauma from the crowbar and knife found by investigators, that it appeared items at the scene had been moved after the victim was killed, and that the victim's death was a homicide. *Id*. Furthermore, statements made to police officers at the scene showed that the defendant stabbed the victim, that the victim was found wrapped in a blanket with the crowbar lying on top of the blanket, and that the defendant attempted to flee the scene and said he did not kill the victim by himself. *Id*. The dissent noted that although no clear analysis was explained in *Williams*, the facts of the case conformed with the general pattern of cases in which a defendant's confrontation rights had been violated, namely that the victim's death was a homicide and that the defendant was the identified suspect before the autopsy was conducted. *Id*. Although the dissent concluded that the autopsy report was conducted for the primary purpose of being used as evidence against the defendant at a trial and implicated the Confrontation Clause, it also concluded that the error was harmless because the testifying medical examiner's conclusions about the victim's cause of death were based upon her independent review of photographs taken during the autopsy. *Id*.

In *State v. Thomas Lee Carey, Jr.*, No. M2013-02483-CCA-R3-CD, 2015 WL 1119454 (Tenn. Crim. App. Mar. 10, 2015), *perm. app. filed* (Tenn. May 5, 2015), this court considered whether the admission of an autopsy report through the testimony of a medical examiner who did not perform the autopsy violated the defendant's confrontation rights. The victim's body was discovered sixty to seventy feet down a steep embankment that "looked like the city dump." *Id*. at *4. The victim's body was decomposed, but police officers saw that his pants were pulled down and that a shirt was tied around his ankles or lower calf. Although no blood was found near the victim, police officers found four small groupings of shell casings from two firearms at the top of the embankment. Utilizing the primary purpose test and relying in part on the majority opinion in *Thomas Lee Hutchison*, this court concluded that the autopsy report was prepared to determine the victim's cause of death and was not prepared for the purpose of "'accusing a targeted individual of engaging in criminal conduct.'" *Id.* at *15 (quoting *Thomas Lee Hutchison*, 2014 WL 1423240, at *30).

Relative to the testifying medical examiner, this court in *Thomas Lee Carey*, likewise, concluded that the trial court properly permitted the witness to testify about her independent conclusions regarding the victim's cause of death. *Id.* at *15. This court noted that as a medical examiner, the witness's testimony was within her field of expertise and that the autopsy report prepared by the performing physician was "'of a type reasonably relied upon by experts.'" *Id.* at *15 (quoting Tenn. R. Evid. 703). The witness provided her independent opinions after she reviewed the autopsy report, the photographs taken during the autopsy, and the crime scene photographs. The court noted that she did not recite the performing medical examiner's conclusions from the report and that the "'Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon.'" *Id.* at *15 (quoting *State v. James Drew Freeman, Jr.*, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *14 (Tenn. Crim. App. May 9, 2012)).

Relative to the autopsy report, the most recent jurisprudence in this area provides little guidance to determine whether a report is testimonial or non-testimonial for confrontation purposes. However, we conclude that the proper analysis is the primary purpose test until the United States Supreme Court or the Tennessee Supreme Court determines otherwise. *See Williams*, 132 S. Ct. at 2242; *see also Thomas Lee Hutchison*, 2014 WL 1423240, at *30; *Thomas Lee Carey, Jr.*, 2015 WL 1119454, at *15.

In the present case, the record reflects that although the Defendant shot the victim, she made statements to witnesses and to the police that the victim was hit by a car. Paramedics who treated the victim at the scene thought the victim had been hit by a car and only discovered the gunshot wound after the victim was in transit to the hospital for treatment. Police officers learned of the shooting after being at the scene for a significant period of time. Pursuant to the primary purpose test, we conclude that the autopsy report was non-

testimonial because it was prepared to determine the victim's cause of death and was not conducted in an effort to accuse a "targeted individual of engaging in criminal conduct." *See Williams*, 132 S. Ct. at 2242. As a result, the autopsy report's admission did not violate the Defendant's confrontation rights. We note that even if the autopsy report were testimonial, any error in its admission would have been harmless beyond a reasonable doubt because the Defendant testified that she shot the victim in the head and that the victim died as a result of the gunshot. The record does not reflect that the cause of death was disputed.

Likewise, we conclude that the Defendant's confrontation rights were not violated by Dr. Laboy's testifying regarding the victim's cause of death, although he did not perform the autopsy. Dr. Laboy was accepted as an expert in forensic pathology and provided his independent opinions that the victim's cause of death was a gunshot wound to the head and that the manner of death was homicide. His expert opinion was based upon his review of the items contained in the medical examiner's file, which included the autopsy and toxicology reports, narratives collected at the time of death, photographs, and diagrams. Dr. Laboy did not simply recite Dr. Caruso's findings and conclusions.

Our rules of evidence permit a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion[.]" Tenn. R. Evid. 702.

> The facts or data . . . upon which an expert bases an opinion . . . may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions . . . upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion . . . unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Tenn. R. Evid. 703. Dr. Laboy testified that autopsy reports were reasonably relied upon by forensic pathologists and that the reports were used during consultations in which a forensic pathologist might be asked to determine whether agreement existed relative to cause and manner of death. Dr. Laboy testified that after reviewing the medical examiner's office file, he concluded that the victim's cause of death was a gunshot wound to the head and that the manner of death was homicide. We note that the "Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon." *See Thomas Lee Carey, Jr.*, 2015 WL 1119454, at *15 (internal quotations and citation omitted). In any event, much of Dr. Laboy's testimony focused on the photographs taken during the autopsy, independent of the autopsy report. In addition, the Defendant

cross-examined Dr. Laboy about his conclusions and highlighted the limitations placed upon his testimony because he did not perform the autopsy. The Defendant is not entitled to relief on this basis.

## V

### Self-Defense Instruction

The Defendant contends that the trial court erred by refusing to instruct the jury relative to self-defense. She argues she testified that she was scared of the victim and that the victim looked as though he was going to attack her when he turned to confront her. The State responds that the court properly denied the Defendant's request for a self-defense instruction because the Defendant acted unlawfully at the time of the shooting by pursuing the victim down the street with a gun. We agree with the State.

A criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses, including self-defense, is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559.

When the evidence presented at the trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Hawkins*, 406 S.W.3d at 129. A jury instruction, though, is "prejudicially erroneous only if the . . . charge, when read as

a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

With respect to self-defense in Tennessee, a person acts in self-defense when that person

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2014).

The record reflects that the trial court denied the Defendant's request for a self-defense instruction because it found that although the Defendant testified she was hurt, embarrassed, humiliated, mad, and angry, she did not testify that she was afraid of the victim at the time she pulled the trigger. The court found that the Defendant testified she did not know what the victim might do and that in the light most favorable to the Defendant, her testimony at most showed the victim turned and might have struck her again. The court found that the testimony did not justify the use of deadly force because the Defendant was not in imminent danger of death or serious bodily injury. The court noted that if the Defendant feared the victim might turn around, walk toward her, and strike her again, the victim was not justified in using deadly force when she followed the victim down the street. The court stated that the Defendant testified she closed her eyes, pulled the trigger, and did not know where the shots were going and that such conduct did not constitute self-defense.

In the light most favorable to the Defendant, the record reflects that the trial court properly denied her request for a self-defense instruction. Although witnesses testified that the victim and the Defendant argued before the shooting, resulting in the victim's striking and kicking the Defendant inside their house, the victim removed himself from the house and walked down the street away from the Defendant. The Defendant obtained a gun she knew was loaded, pursued the victim, and yelled at and cursed the victim from a distance. Witnesses who saw the Defendant following the victim testified that the Defendant was upset, talking crazy, and agitated. Upon the Defendant's cursing the victim, the victim stopped and turned. Although the Defendant said she pulled out the gun, closed her eyes, and fired the gun when the victim began walking toward her, she never testified that she was in

fear of her life or of serious bodily injury.  Although the Defendant discussed her general fear of the victim and her not calling the police when the victim previously abused her, she stated that at the time of the shooting, she was not thinking clearly and saw red and stars while thinking of the previous abuse she endured from the victim.  We note that the Defendant's leaving the house with a loaded gun and pursing the victim after he left the house was not lawful conduct.  The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions for voluntary manslaughter and false report.  However, we reverse the judgment for employing a firearm during the commission of a dangerous felony, vacate the conviction, and dismiss the charge.

_____
ROBERT H. MONTGOMERY, JR., JUDGE